OPINION
{¶ 1} In case number 5-06-52, Mother-Appellant, Shirley Owens, appeals the judgment of the Hancock County Court of Common Pleas, Juvenile Division, granting permanent custody of her son, J.P., Jr., (hereinafter referred to as "J.P."), to the Hancock County Job and Family Services, Children Protective Services Unit (hereinafter referred to as "CPSU"). In case number 5-06-53, Mother appeals the judgment of the Hancock County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughter, G.P., to CPSU. In this consolidated appeal, Mother asserts that the trial court erred in granting permanent custody to CPSU because it failed to develop and implement an adequate case plan; that the trial court's decision was against the manifest weight of the evidence; that the trial court abused its discretion by denying her request for a continuance to complete psychological evaluations of J.P. and G.P.; that the trial court erred by refusing to remove Todd Owens as a party to the permanent custody hearing; that the trial court erred and violated her due process rights by denying her request to call G.P. to testify; and, that the trial court erred in granting CPSU permanent custody of *Page 4 
J.P. and G.P. because it was not in their best interest. Based on the following, we affirm the judgments of the trial court.
 {¶ 2} J.P. (DOB: 12/17/1993) and G.P. (DOB: 10/20/98), (hereinafter J.P. and G.P. jointly referred to as "the children"), are the children of J.P., Sr., (hereinafter referred to as "Father") and Mother. Todd Owens, (hereinafter referred to as "Owens"), is Mother's husband and the children's step-father.[1]
 {¶ 3} On November 7, 2003, CPSU filed complaints alleging that the children were neglected and dependent. In addition, CPSU requested that the children be placed under its emergency protective supervision following an incident whereby a neighbor witnessed Owens drag J.P. across the yard, yell at him as he got into Mother's vehicle, chase the vehicle and jump on it, and crawl through its sunroof to get to J.P. The trial court granted the request.
 {¶ 4} In December 2003, CPSU submitted its case plan, which the trial court approved. Additionally, the trial court appointed a Guardian Ad Litem, (hereinafter referred to as "the GAL"), to represent the children.
 {¶ 5} In January 2004, the trial court adjudicated the children dependent under R.C. 2151.04(c)[2] and ordered that Owens have no contact with them. Also, CPSU moved to amend its prior case plan in order to add protective daycare for the children, which the trial court adopted. *Page 5 
 {¶ 6} In February 2004, following an incident whereby Mother allowed Owens to return to the home in violation of the no contact order and, within twenty-four hours, he struck J.P. in the face, causing his nose to bleed, CPSU moved for ex parte temporary custody of the children, which the trial court granted. Additionally, the trial court ordered supervised visitation with the children for both Mother and Father and again ordered Owens to have no contact with the children.
 {¶ 7} Later in February, CPSU moved for a change of disposition from temporary custody to relative placement with protective supervision to allow placement of the children with their maternal grandparents, which the trial court granted. Additionally, CPSU submitted a new case plan, which the trial court adopted.
 {¶ 8} In May 2004, the GAL withdrew and the trial court appointed a new GAL.
 {¶ 9} In June 2004, CPSU recommended that Mother progress to unsupervised visitation with the children, subject to specified restrictions.
 {¶ 10} In August 2004, Mother moved for a change of disposition, which she subsequently withdrew.
 {¶ 11} In October 2004, the GAL filed reports regarding the children, concluding that they should remain with their maternal grandparents. *Page 6 
 {¶ 12} In November 2004, CPSU filed its semi-annual review, reporting that, despite CPSU's instructions to the contrary, the children's maternal grandparents had allowed their other daughter, her husband, and their four children to move into the residence. As a result, J.P. sexually abused his four-year old cousin, as well as G.P., in their maternal grandparents' residence. Consequently, CPSU moved for an emergency ex parte order for temporary custody of the children, which the trial court granted. Additionally, the trial court ordered that the children be removed from their grandparents' residence and that all contact between the children be supervised. Thereafter, G.P. was placed in a foster home, whereas J.P. was placed in a foster group home specializing in adolescent male sex offenders. Subsequently, CPSU filed an amended case plan reflecting these changes, which the trial court approved.
 {¶ 13} In January 2005, Mother moved for dispositional review, requesting that the trial court review the children's placements, the case plan, and CPSU's attempts to implement the case plan. Also, CPSU changed the visitation arrangements to allow Owens to have supervised visitation with G.P. for the purposes of home-based therapy, while maintaining Owens' no contact order with J.P.
 {¶ 14} In February 2005, CPSU submitted a new case plan recommending that Mother, Owens, and the children undergo psychological evaluations, which *Page 7 
the trial court approved. Subsequently, CPSU referred Mother, Owens, and the children to Dr. David K. Connell to conduct the psychological evaluations.
 {¶ 15} In April 2005, the GAL filed reports regarding the children, concluding that they should remain in their foster placements.
 {¶ 16} In August 2005, J.P. was moved from the foster group home to the Hannah Neil Center, (hereinafter referred to as "the Center"), a treatment facility for juvenile sexual offenders. Thereafter, CPSU filed a new case plan reflecting this change, which the trial court approved.
 {¶ 17} On October 20, 2005, CPSU moved for permanent custody of the children under R.C. 2151.353, R.C. 2151.413, and R.C. 2151.414. Subsequently, CPSU filed a new case plan reflecting this change.
 {¶ 18} In November 2005, CPSU gave notice by publication to Father regarding its permanent custody motion after failing to locate him.
 {¶ 19} In January 2006, Mother requested that the trial court conduct in camera interviews with the children and moved to have a second psychological evaluation performed on herself. Also, the GAL filed a preliminary dispositional report, recommending that the trial court grant CPSU permanent custody of both children. The trial court granted Mother's motion for a second psychological evaluation, took her motion regarding in camera interviews of the children under advisement, and continued CPSU's motion for permanent custody. *Page 8 
 {¶ 20} In February 2006, the trial court appointed Dr. Thomas Hustak to conduct Mother's second psychological evaluation, and CPSU amended its motion for permanent custody, adding that Father had abandoned the children.
 {¶ 21} In March 2006, Mother requested a new attorney.
 {¶ 22} In May 2006, Mother moved to temporarily lift the no contact order between Owens and J.P. for the purposes of completing her psychological evaluations, which the trial court granted on the condition that Dr. Hustak be present at all times. Also, the GAL filed reports regarding the children, recommending that CPSU be granted permanent custody of them. The trial court granted Mother's March 2006 request for new counsel, continued the permanent custody matter pending appointment of Mother's new counsel, and granted Mother's January 2006 motion for the trial court to conduct in camera interviews with the children.
 {¶ 23} In July 2006, CPSU filed an amended motion for permanent custody.
 {¶ 24} In August 2006, the trial court conducted the in camera interviews with the children, whereat J.P. stated he wanted to live with Mother and G.P. stated she wanted to be adopted.
 {¶ 25} In September 2006, the trial court gave notice of the children's in camera statements and ordered Mother not to discuss any aspect of G.P.'s in *Page 9 
camera interview with her. Also, Owens moved for visitation with the children. Additionally, Mother filed notice that she intended to call G.P. as a witness at the permanent custody hearing and moved for a continuance of the permanent custody hearing so that the children could undergo psychological evaluations. In response, CPSU moved to quash Mother's subpoena of G.P. and the trial court overruled Mother's motion for a continuance.
 {¶ 26} On September 26, 27, 28, and 29, 2006, the trial court conducted a hearing on CPSU's motion for permanent custody of the children, at which the following occurred.
 {¶ 27} At the outset, the trial court addressed several motions. Regarding CPSU's prior written motion to quash Mother's subpoena of G.P., CPSU recounted that G.P.'s therapist indicated that G.P. was scared to testify and "froze up" thinking about it. (Hearing Tr., Vol. I, p. 18). Additionally, both G.P.'s attorney and the GAL's attorney argued that making G.P. testify would be damaging to her and that G.P. stated that she was very scared and had already talked to the trial court judge. Mother responded that she had a right to call G.P. to testify given she was a party. The trial court reserved ruling on the matter.
 {¶ 28} Next, Mother orally renewed her motion for a continuance, which the trial court overruled because, at the pretrial conference held a few weeks before the permanent custody hearing, it had specifically asked whether there was *Page 10 
any reason why the matter could not move forward, to which no one replied in the affirmative. Additionally, the trial court noted the hearing had already been continued "several times." (Hearing Tr., Vol. I, p. 27).
 {¶ 29} Then, Mother made an oral motion to remove Owens as a party because she had filed for divorce from him. CPSU responded that Owens had been part of the case from the beginning; that the issue of divorce was raised late; and, that Mother and Owens had broken up several times before and later reconciled. Likewise, Owens stated that he wished to remain a party and that he believed Mother's divorce filing was a sham because they were trying to reconcile. Thereafter, the trial court overruled Mother's oral motion to dismiss Owens as a party.[3]
 {¶ 30} Lastly, the trial court addressed Owens' prior written motion for visitation with the children, reserving its ruling on the matter until it determined the outcome of the permanent custody hearing.
 {¶ 31} On the second day of the hearing, the trial court granted CPSU's motion to quash Mother's subpoena of G.P., finding that making G.P. testify would harm her based upon her therapist's testimony, her attorney's statement, and the GAL's attorney's statement. *Page 11 
 {¶ 32} At the hearing, the following testimony was adduced.
 {¶ 33} Rodney Traxler, CPSU's caseworker assigned to the case, testified that both the December 2003 and January 2004 case plans indicated that CPSU's goal was to "maintain the children in their own home." (Hearing Tr., Vol. IV, pp. 863-64; Ex. 30-31). In both case plans, CPSU recommended that Mother and Owens submit to mental health and substance abuse assessments, marital counseling, and the Parent Program for intensive parenting education; that J.P. undergo counseling; and, that G.P. undergo an assessment to determine whether she was in need of counseling.
 {¶ 34} Traxler continued that CPSU's goal changed from maintaining the children in their own home to "reunification, with the children being with certified, approved relatives' homes" after the children were removed from Mother's and Owens' residence and placed with their grandparents in February 2004. (Hearing Tr., Vol. IV, p. 866; Ex. 32). Consequently, CPSU's objectives changed, recommending mental health counseling for Mother, substance abuse counseling and domestic violence treatment for Owens, and intensive parenting intervention for the children's grandparents.
 {¶ 35} Traxler further stated that the case plan was again amended in November 2004, following the children's removal from their grandparents. The *Page 12 
amended case plan dropped the recommendation regarding the grandparents and added home-based therapy for Mother. The case plan was further amended in February 2005 in order to expound upon the objectives for Owens after he became active in the case again.[4] Under the case plan, Owens was required to undergo mental health therapy, domestic violence therapy, and to complete another substance abuse assessment due to a criminal drug charge. Additionally, the case plan recommended that Mother attend group therapy per her therapist's recommendation; that the family undergo psychological evaluations to see if any other services could aid in achieving reunification and follow through with any resulting recommendations; and, that Mother and Owens attend Parent Project Senior because home-based therapy had terminated.
 {¶ 36} Traxler indicated that CPSU filed another amended case plan in August 2005, solely to account for the change in J.P.'s placement from the foster group home to the Center.
 {¶ 37} Traxler admitted that both the February 2005 and August 2005 case plans indicated that the children, Owens, and Mother needed psychological evaluations, but that the children had not received such evaluations. Traxler explained that CPSU referred Mother, Owens, and the children to Dr. Connell for psychological evaluations as required, but Dr. Connell ultimately decided *Page 13 
evaluations of the children were unnecessary based upon the outcomes of Mother's and Owens' evaluations.
 Testimony Regarding Mother {¶ 38} Carol Taylor, who oversaw the Parent Project program, testified that Mother completed both Parent Project Junior and Senior.
 {¶ 39} Christine Davidson testified that she conducted home-based therapy with Mother and the children for one month in July 2004. During group visits with the children, Davidson observed Mother yell and curse at the children, threaten physical violence twice, and, on one occasion, push J.P. to the ground and jump on top of him because he had continuously disobeyed her. On another occasion, Davidson observed Mother slap J.P. on the leg and threaten to smack him and "bash his head in." (Hearing Tr., Vol. III, p. 579). Davidson reported these incidents to CPSU and also reported that, on one occasion, Owens had been at Mother's house in violation of the no contact order. Thereafter, Mother yelled and cursed at Davidson, accused her of spying for CPSU, and threatened to sue her. Subsequently, CPSU transferred Mother's home-based therapy to Catherine Bouillon.
 {¶ 40} Bouillon worked with the family from September 2004 to April 2005.[5] Bouillon testified that home-based therapy is designed for families close to *Page 14 
reunification; that Mother initially made progress in dealing with the children; that Mother had difficulty believing her parenting style was inappropriate; that Mother's progress slowed around November 2004; that Owens became involved in the home-based therapy sessions in February or March 2005; and, that a domestic violence incident occurred between Mother and Owens around that time,[6] after which their parenting progress "came to a standstill" because they focused on their relationship instead of their parenting skills. (Hearing Tr., Vol. III, p. 635). Shortly thereafter, Bouillon opted to discontinue the home-based therapy because the family was not any closer to reunification.
 {¶ 41} Valerie Liebert, Mother and Owens' marital counselor, testified that, between May 2005 and December 2005, their attendance at counseling sessions was very irregular and that they made little progress. Liebert stated that since March 2006, they had attended more regularly and made significant progress in their ability to take responsibility for their actions. However, Liebert noted that she was concerned domestic violence continued to occur given all the treatment Mother and Owens had received; that she knew Mother was still living with Owens despite filing for divorce; that Mother still had significant issues to resolve in therapy and could not adequately care for the children at that time; but, that if *Page 15 
Mother continued at the same rate of progress, obtained and maintained a stable job, divorced Owens, and avoided relationships with men for several years, she might be capable of taking care of G.P. in a year.[7] Liebert also stated that she had never observed any bias from CPSU toward Mother.
 {¶ 42} Lynn Davis-Snyder, Mother's former therapist, testified that she treated Mother from August 2003 until December 2005 and diagnosed her with personality disorder, not otherwise specified. Davis-Snyder admitted that she did not know Mother's current ability to function; that Mother was the most motivated and capable in her family; and, that Mother truly loved and cared for the children.
 {¶ 43} Dr. Connell, a psychologist, testified that, upon CPSU's referral, he conducted psychological evaluations of Mother and Owens in February, April, and May 2005 to determine their parental fitness. Dr. Connell concluded that Mother's and Owens' relationship was codependent; that their relationship was chaotic and unstable; that Mother did not believe she needed to change; that Mother suffered from borderline personality disorder;[8] that, although she did not abuse drugs or alcohol, Mother tolerated people around her who did; that Mother had boundary issues with the children; and, that she would probably need at least *Page 16 
two or three more years of intense therapy to obtain "any meaningful behavior change." (Hearing Tr., Vol. II, p. 436).
 {¶ 44} Dr. Connell continued that he interviewed J.P. and observed G.P. as part of his evaluation of Mother's and Owens' parenting. However, Dr. Connell stated he did not need to conduct full psychological assessments of the children to conclude that parenting J.P. would be "very, very, very difficult" for Mother, and that she could not function well enough to parent G.P. or any child. (Hearing Tr., Vol. II, p. 382). Dr. Connell admitted that severing Mother's parental rights from J.P. would be traumatic to him and possibly detrimental in the short term, but better in the long term. Dr. Connell also noted that Traxler had not influenced his conclusions.
 {¶ 45} Dr. Thomas Hustak, a psychologist, testified that he conducted Mother's and Owens' second psychological evaluation to assess their parenting skills in March, April, and May 2006. Dr. Hustak diagnosed Mother with personality disorder, not otherwise specified, and diagnosed Owens with antisocial personality disorder and past substance dependence. Dr. Hustak admitted that Mother's and Owens' likelihood of making the necessary changes to reunify with the children within the next six months was "quite low"; that the personality traits of people with personality disorders are "very difficult to change"; that Mother had "significant difficulties" cultivating healthy parent-child relationships; that, on *Page 17 
one occasion G.P. greeted J.P. by jumping on him and straddling him with her legs, to which Mother had no reaction and failed to intervene; and, that certificates of completion for parenting classes do not mean much unless real behavioral change is exhibited. (Hearing Tr., Vol. IV, p. 749, 751, 761).
 {¶ 46} Dr. Hustak stressed that he evaluated Mother and Owens solely for the purposes of determining parental fitness, not to evaluate the best interests of the children. Consequently, Dr. Hustak could not formulate an opinion on whether Mother would be able to parent either of the children within a year. Dr. Hustak also stated that he did not detect any bias from Traxler toward Mother or Owens.
 {¶ 47} Deb Dyer, Mother's current therapist, testified that she conducted individual and group therapy with Mother, who attended regularly and benefited from it; that Mother might be able to complete both individual and group therapy in a year; but, that external factors could impact her progress.
 {¶ 48} Leanda Hoepf, a domestic violence program facilitator, testified that Mother completed the Violence Recovery Project, which consisted of twenty-seven weekly one-hour sessions, in August 2006. However, Hoepf recounted that Mother contacted her in September 2006 to inform her of a domestic violence incident that occurred with Owens a few days prior. *Page 18 
 {¶ 49} James C. Jarrett, Mother's probation officer, testified that Mother was placed on probation in February 2006 after serving fifteen days in jail for a misdemeanor; that she was placed on probation again in July 2006 after serving three days in jail for another misdemeanor; and, that she had four pending misdemeanor charges against her.
 Testimony Regarding Owens {¶ 50} Officer William Hammer of the Firelands Regional Medical Center testified that he served as Owens' chemical dependency counselor beginning in January 2006. Officer Hammer stated that Owens' attendance was above average; that he successfully completed the intensive outpatient treatment; that he remained in individual therapy and an aftercare program; but, that Owens relapsed by using crack cocaine in July 2006.
 {¶ 51} Dr. Connell testified that Owens suffered from antisocial personality disorder; that he was not fit to parent the children due to his extensive criminal history, his antisocial attitude, and his lack of determination to deal effectively with his substance abuse; and, that his prognosis for treatment was poor.
 Testimony Regarding G.P. {¶ 52} Connie Crego-Stahl, G.P.'s therapist, testified that she began counseling G.P. in 2004; that Mother and G.P.'s grandmother were initially involved in G.P.'s therapy sessions, but she regressed behaviorally during that *Page 19 
time; and, that G.P. did not make much progress overall. Crego-Stahl admitted that G.P. only talked about her past sexual abuse by J.P. once, when Mother was present; that, if CPSU obtained permanent custody of G.P., it would be stressful and emotionally hurtful to her; and, that G.P. had consistently stated that she wished to reside with Mother until July 2006, at which time she stated that she wanted to be adopted. Crego-Stahl further noted that a psychological evaluation of G.P. was unnecessary and that making her testify would "cause a great deal of stress." (Hearing Tr., Vol. I, p. 55).
 {¶ 53} Traxler testified that G.P. engaged in obstinate behavior; that she still needed to work through sexual abuse issues; that she had boundary issues; but, that her behavior and schoolwork had improved since being placed in foster care. Traxler stated that, overall, Mother and G.P. enjoyed their visits and interacted appropriately; that G.P. had always expressed a desire to live with Mother until a few months before the permanent custody hearing; that neither Traxler nor G.P.'s foster parents suggested to G.P. that she should be adopted; and, that G.P.'s foster parents indicated they do not wish to adopt G.P.
 {¶ 54} James Kelly, the GAL, testified that in May 2006, G.P. said she wanted to live with Mother, but in August 2006, she said she wanted to be adopted like two other girls living in her foster home "because they're happy. I want a happy home." (Hearing Tr., Vol. V, p. 1075). Kelly emphasized that G.P. raised *Page 20 
the adoption issue without any prompting; that he was surprised she had changed her mind; and, that her foster parents indicated from the outset that they did not wish to adopt her. Kelly admitted that G.P. was impressionable and had probably been influenced by the two younger girls at her foster home, but he added that her change of mind could also be attributed to viewing and wanting a normal, healthy family. Kelly recommended permanent custody be granted to CPSU so G.P. could be placed for adoption.
 Testimony Regarding J.P. {¶ 55} Traxler testified that J.P. still had major issues with sexual offending behavior and was a high risk for re-offending; that he made some progress in his ability to calm himself, be less argumentative, and be less physically aggressive, but made minimal progress elsewhere; that he could not reside in any home with children present because he might sexually abuse them; that he had sexual fantasies about Mother; that Mother consistently attended J.P.'s family therapy sessions; that, when Mother was present for therapy sessions, he made progress in his ability to disclose his past sexual abuse by her family members; but, that he still propositioned sex from others at the treatment facility, exposed himself to others, and had regressed behaviorally. Traxler concluded that CPSU should be granted permanent custody of J.P., but that he would not object to Mother's continued involvement in J.P.'s therapy if deemed beneficial to him. *Page 21 
 {¶ 56} Stacy Mitchell, J.P.'s therapist at the Center, testified that Mother participated in family sessions with J.P. on a weekly basis; that J.P. needed years of therapy because he was a severe case; that Mother contributed to his issues; that J.P. would struggle whether Mother was involved, but that his prognosis was better if she remained involved; and, that J.P. should not return to Mother's residence. Mitchell also indicated that Traxler sometimes focused more on the weaknesses of the family instead of its strengths. However, Mitchell admitted that Traxler may have been informing her of all that was happening within the family.
 {¶ 57} Lucas Hawkins, a senior clinician at the Center, testified that J.P. should not be returned to Mother's residence due to the severity of his problems and because he views his family as a peer group. Hawkins noted that Mother visited J.P. often; that she was involved in J.P.'s treatment and contributed positively; that J.P. looked forward to seeing her and had a strong desire to return to his family; that J.P. had inappropriate feelings toward her; and, that if she could no longer visit, J.P.'s treatment might suffer in the short term.
 {¶ 58} Finally, Kelly, the GAL, testified that J.P. wanted to live with Mother; that CPSU should be given permanent custody of J.P.; and, that if J.P.'s therapists deemed Mother's involvement in his therapy necessary, it should be allowed. Kelly acknowledged that, if J.P. remained in custody of CPSU until he turned eighteen, without being adopted, he could be damaged. *Page 22 
 {¶ 59} After the hearing, in October 2006, the trial court overruled Owens' September 2006 motion for visitation with the children and granted CPSU's motion for permanent custody.[9] In doing so, the trial court found by clear and convincing evidence that, after considering the requisite factors under 2151.414(D)(1)-(4) and R.C. 2151.414(E)(7)-(11), it would be in the best interest of each child to grant permanent custody to CPSU; that the children had been in CPSU's temporary custody for twelve or more months of a consecutive twenty-two month period; that, in the alternative, the children could not or should not be placed with either parent within a reasonable time under R.C. 2151.414(E)(1); that continuation in the home would be contrary to the children's welfare; and, that CPSU made reasonable efforts to finalize a permanency plan.
 {¶ 60} Regarding the best interests of the children, the trial court considered their custodial history, their wishes, and "the rampant sexual abuse history in Mother's family including acts committed against [them] by [their] relatives," in making its determination. Specific to G.P. the trial court also found that Mother had "failed to adopt minimum skills and parenting techniques despite the efforts of numerous agencies" and that Father had "a complete lack of involvement * * * in any aspect of [G.P.'s] life." (October 6, 2006 Journal Entry, p. 3). Specific to J.P., the trial court also found that Mother had "failed to learn minimum parenting *Page 23 
techniques despite the efforts of numerous child-care professionals." (October 6, 2006 Journal Entry, p. 3).
 {¶ 61} In determining that the children could not or should not be placed with their parents in a reasonable time, the trial court considered the parents' use of the available services and resources in finding that "the parents have failed continuously and repeatedly to substantially remedy the conditions which caused [the children] to originally be placed in care on February 5, 2004"; that Mother's mental disorder and Father's chemical dependency were "so severe that it makes the parent unable to provide an adequate permanent home for [the children] at the present time and, as anticipated, within one year after this date"; that "the parents have demonstrated a lack of commitment * * * by showing an unwillingness to provide an adequate permanent home * * * that would prevent [the children] from suffering physical, emotional or sexual abuse" or neglect; that Father was a "chronic drug user with a criminal record and has had no contact with [G.P.] while [she] has been in CPSU custody," had only one contact with J.P., and failed to appear at any of the hearings despite proper notice; that Mother "frequently resides" with Owens, "who has subjected [her] to acts of domestic violence in addition to being a current user of crack cocaine"; and, that Owens had "an extensive criminal history and is currently on probation to several courts in Seneca *Page 24 
County and would not be a suitable person to reside with [the children]." (October 6, 2006 Journal Entry, pp. 3-4).
 {¶ 62} It is from this judgment that Mother appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO HANCOCK COUNTY JOB AND FAMILY SERVICES BECAUSE THE HCJFS FAILED TO DEVELOP AND IMPLEMENT A CASE PLAN REASONABLY CALCULATED TO ACHIEVE THE GOAL OF REUNIFICATION OF THE MINOR CHILDREN.
 Assignment of Error No. II THE TRIAL COURT'S DECISION TO TERMINATE THE APPELLANT'S PARENTAL RIGHTS AND GRANT PERMANENT CUSTODY TO THE DEPARTMENT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 Assignment of Error No. III THE TRIAL COURT'S DECISION TO DENY APPELLANT'S COUNSEL'S REQUEST FOR A CONTINUANCE TO COMPLETE THE PSYCHOLOGICAL EVALUATIONS FOR THE CHILDREN WAS AN ABUSE OF DISCRETION.
 Assignment of Error No. IV THE TRIAL COURT ERRED IN NOT REMOVING TODD OWENS AS A PARTY IN THE PERMANENT CUSTODY HEARING.
 Assignment of Error No. V THE TRIAL COURT ERRED IN DENYING THE APPELLANT (Sic.) DUE PROCESS RIGHT TO CALL THE MINOR CHILD [G.P.] TO TESTIFY. *Page 25 
 Assignment of Error No. VI THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY FOR THE CHILDREN BECAUSE IT WAS NOT IN THEIR BEST INTEREST.
 {¶ 63} Due to the nature of Mother's assignments of error, we elect to address them out of order and assignments of error two and six together. Our review of a grant of permanent custody begins by noting that "[i]t is well recognized that the right to raise a child is an `essential' and `basic civil right.'" In re Hayes (1997), 79 Ohio St.3d 46, 48, citingIn re Murray (1990), 52 Ohio St.3d 155, 157. Parents have a fundamental liberty interest in the care, custody, and upbringing of their children.Murray, 52 Ohio St.3d 157; Santosky v. Kramer (1982), 455 U.S. 745, 753. However, a natural parent's rights are not absolute. In re Thomas, 3d Dist. No. 5-03-08, 2003-Ohio-5885, ¶ 7. Additionally, we will apply the following standards of review throughout.
 Standards of Review {¶ 64} The abuse of discretion standard applies to Mother's third, fourth, and fifth assignments of error regarding the trial court's denial of her motion for a continuance, the trial court's denial of her motion to dismiss Owens as a party, and the trial court's quashing of her subpoena of G.P. to testify, respectively. See, e.g. In re Baby GirlDoe, 149 Ohio App.3d 717, 731, 2002-Ohio-4470, citing Hartt v.Munobe (1993), 67 Ohio St.3d 3, 9, and Pons v. Ohio State Med. Bd.
(1993), *Page 26 66 Ohio St.3d 619, 621 (denial or grant of a motion to continue a hearing lies within the broad discretion of a trial court and will not be disturbed absent an abuse of discretion); In re Hitchcock (1996),120 Ohio App.3d 88, 97 (trial court has wide discretion regarding designation of an individual as a party to the juvenile proceeding before it and such determination will not be reversed absent an abuse of discretion); In re Sherman, 3d Dist. Nos. 5-06-21, 5-06-22, 5-06-23,2006-Ohio-6485, ¶ 7 ("the decision whether to allow a child to attend a hearing on a motion for permanent custody is within the sound discretion of the trial court" and will not be overturned absent an abuse of discretion). An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 65} Conversely, the clear and convincing evidence standard must be applied to Mother's first, second, and sixth assignments of error challenging the trial court's grant of permanent custody to CPSU.
 {¶ 66} Permanent custody determinations made under R.C. 2151.414 must be supported by clear and convincing evidence. Doe,149 Ohio App.3d at 738, citing In re Hiatt (1993), 86 Ohio App.3d 716, 725. Clear and convincing evidence is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be *Page 27 
established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-04. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Cross v. Ledford (1954),161 Ohio St. 469, 477 citing Ford v. Osborne (1887), 45 Ohio St. 1, Cole v.McClure (1913), 88 Ohio St. 1, and Frate v. Rimenik (1926),115 Ohio St. 11. Thus, we are required to determine whether the trial court's determination was supported by sufficient credible evidence to satisfy the requisite degree of proof. In re McCann, 12th Dist. No. CA2003 — 02-017, 2004-Ohio-283, ¶ 12, citing In re Starkey,150 Ohio App.3d 612, 617, 2002-Ohio-6892.
 Assignment of Error No. III {¶ 67} In her third assignment of error, Mother contends that the trial court abused its discretion by denying her request for a continuance to complete the psychological evaluations of the children. Specifically, Mother asserts that the children were ordered to have psychological evaluations as part of the binding, journalized case plan, to which CPSU failed to adhere, and that the evidence *Page 28 
demonstrated the psychological evaluations of the children were important to the permanent custody determination. We disagree.
 {¶ 68} R.C. 2151.412 establishes the guidelines for case plans and provides that all parties are "bound by the terms of the journalized case plan. A party that fails to comply with the terms of the journalized case plan may be held in contempt of court." R.C.2151.412(E)(1). However, a trial court "shall not deny an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan." R.C.2151.414(C).
 {¶ 69} Here, Dr. Connell completed his psychological evaluations of Mother and Owens in May 2005, while Dr. Hustak completed his psychological evaluations of Mother and Owens a year later in May 2006. Interestingly, Mother did not demand completion of the psychological evaluations of the children at either of those times or at the pretrial conference several weeks before the permanent custody hearing; instead, she waited until September 14, 2006, less than two weeks prior to the hearing, to request a continuance for the psychological evaluation of the children. The trial court stressed this fact in its denial of Mother's motion for a continuance, and we cannot find that the trial court acted unreasonably, arbitrarily, or unconscionably in doing so.
 {¶ 70} Additionally, the evidence indicates that CPSU did make the children available to Dr. Connell for evaluations in compliance with the case plan, *Page 29 
but that he opted not to evaluate them given the outcomes of Mother's and Owens' evaluations. G.P.'s therapist also testified that a psychological evaluation was not necessary. The fact that Dr. Hustak's opinion differed from Dr. Connell's and G.P.'s therapist on this issue implicated a credibility determination best resolved by the trier of fact, for which we cannot substitute our judgment. State v. Boston
(1989), 46 Ohio St.3d 108, 128, modified on other grounds by State v.Dever (1992), 64 Ohio St.3d 401; State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of syllabus.
 {¶ 71} Moreover, even if we concluded that CPSU failed to ensure that the children underwent psychological evaluations in violation of the case plan, this fact alone does not preclude an award of permanent custody to CPSU. See In re S.M., 10th Dist. No. 05AP-1262,2006-Ohio-2529, ¶ 13 (agency's failure to schedule a mother for psychiatric evaluation as required by case plan, alone, did not preclude grant of permanent custody to agency); R.C. 2151.414(C). Thus, we find that the trial court did not act unreasonably, arbitrarily, or unconscionably by denying Mother's motion for a continuance.
 {¶ 72} Accordingly, we overrule Mother's third assignment of error. Assignment of Error No. IV {¶ 73} In her fourth assignment of error, Mother contends that the trial court erred by failing to remove Owens as a party in the permanent custody *Page 30 
hearing. Specifically, Mother asserts that, because she filed for divorce from Owens on September 12, 2006, prior to the permanent custody hearing, he should have been dismissed as a party. We disagree.
 {¶ 74} R.C. 2151.28(C)(1), governing notice in juvenile proceedings, provides, in pertinent part:
 The court shall direct the issuance of a summons directed to the child * * *, the parents, * * * and any other persons that appear to the court to be proper or necessary parties to the proceedings[.]
Similarly, Juv.R. 15(A) requires issuance of a summons following the filing of a complaint "to the child, the parents, * * * and any other persons who appear to the court to be proper or necessary parties." A "party" is defined as "a child who is the subject of a juvenile court proceeding, * * * the child's parent or parents, * * * and any other person specifically designated by the court." Juv.R. 2(Y).
 {¶ 75} Here, the trial court determined that Owens was a vital part of the case, and a review of the record supports that determination. Owens contributed to the initiation of CPSU's proceedings against Mother with his behavior, resided in the same home with the children until their removal, interacted with the children as a parent, was included in CPSU's case plans and services, filed motions with the trial court, participated in services targeted toward the family as a unit, and, except for the last day, attended and was represented by counsel at the permanent custody hearing. Additionally, several witnesses testified that the dynamics of *Page 31 
Mother's relationship with Owens was an important factor in determining her ability to parent. Mother's decision to file for divorce from Owens a mere two weeks prior to the permanent custody hearing does not erase these facts, particularly in light of Owens' assertion that the divorce filing was a sham and their history of separating and reconciling. Thus, we find that the trial court did not act unreasonably, arbitrarily, or unconscionably by denying Mother's motion to dismiss Owens as a party.
 {¶ 76} Accordingly, we overrule Mother's fourth assignment of error.
 Assignment of Error No. V {¶ 77} In her fifth assignment of error, Mother contends that the trial court erred by denying her due process right to call G.P. to testify. Specifically, Mother asserts that the evidence indicated that G.P.'s therapist and the GAL were surprised that G.P. had changed her mind about wanting to be adopted and that Mother had a due process right to explore why G.P. had changed her mind. We disagree.
 {¶ 78} Both R.C. 2151.35(A)(1) and Juv.R. 27 provide that the trial court "may excuse the attendance of the child at the hearing" in cases involving dependent children. Additionally, R.C. 2151.414(D)(2) provides that a child's wishes may be "expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." Thus, a trial court has the *Page 32 
option to allow children to express their wishes through an in camera interview or testimony, or can rely on the guardian ad litem's representations of their wishes without violating a party's due process right. In re Funk, 11th Dist. Nos. 2002-P-0035, 2002-P-0036, 2002-Ohio-4958, ¶ 30, citing In re Whitaker (1988), 36 Ohio St.3d 213,219.
 {¶ 79} Here, a review of the record supports the trial court's decision to quash Mother's subpoena of G.P. The trial court conducted in camera interviews of the children at Mother's request and informed her of their statements. Mother's desire to make G.P. testify after the in camera interview would defeat its purpose. Whitaker,36 Ohio St.3d at 218 ("The purpose of an in camera interview is to protect the child from having to say negative things about [a] party or express a custodial * * * preference in the presence of the parties"). Additionally, G.P.'s therapist, attorney, and the GAL all stated that she was frightened to testify in front of everyone, did not wish to testify, and would be traumatized and stressed if made to do so. Although CPSU's caseworker, G.P.'s therapist, and the GAL were surprised that G.P. had changed her mind, they also noted that her decision was not prompted by anyone, including her foster parents. Thus, we find that the trial court did not abuse its discretion by quashing Mother's subpoena of G.P.
 {¶ 80} Accordingly, we overrule Mother's fifth assignment of error. *Page 33 
 Assignment of Error No. I {¶ 81} In her first assignment of error, Mother contends that the trial court erred in granting CPSU permanent custody because CPSU failed to develop and implement a case plan reasonably calculated to achieve reunification with the children. Specifically, Mother asserts that she substantially complied with the case plan by actively participating in several programs; that she never had an opportunity to parent either child in the home setting after their removal; and, that CPSU told her reunification was the goal, but really worked toward permanent custody. We disagree.
 {¶ 82} R.C. 2151.419 requires public children services agencies to make reasonable efforts "to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." R.C. 2151.419(A)(1). The public children services agency bears the burden of showing that it made the requisite reasonable efforts, and the child's "health and safety shall be paramount" in determining whether the agency met its burden. R.C. 2151.419(A)(1). To that end, agencies utilize case plans to facilitate reunification by establishing individualized concerns and goals, and identifying the steps the parents and the agency must take to achieve reunification. Thomas,2003-Ohio-5885 at ¶ 9, citing In re Evans, 3d Dist. No. 1-01-75, 2001-Ohio-2302. "Agencies have an *Page 34 
affirmative duty to diligently pursue efforts to achieve the goals in the case plan. Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances." Id.
 {¶ 83} Here, CPSU provided ample evidence at the hearing to demonstrate that it made reasonable and diligent efforts to reunify the family under the circumstances. CPSU made comprehensive services available to Mother to address her specific issues, including home-based therapy, mental health therapy, group therapy, domestic violence therapy, marital counseling, and parenting programs. CPSU worked with Mother for over two years and amended the case plan and goals as necessary to fit the situation. CPSU also made services available to Owens and the children targeting their specific issues.
 {¶ 84} Additionally, contrary to Mother's assertions, Bouillon spent seven months working with her, Owens, and the children in the home setting, well over the twelve weeks typically spent in home-based therapy, but eventually ceased because they made little to no progress. Although Mother claims she substantially complied with the case plan by attending and completing several programs, both Dr. Connell and Dr. Hustak indicated that significant, substantive change was needed, not just mere attendance. Additionally, substantial compliance with a case plan, without more, does not entitle a parent to custody. In reGomer, 3d Dist. *Page 35 
Nos. 16-03-19, 16-03-20, 16-03-21, 2004-Ohio-1723, ¶ 36, citing In theMatter of McKenzie (1995), 9th Dist. No. 95CA0015, 1995 WL 608285. Instead, courts must consider "`not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal.'"Gomer, 2004-Ohio-1723 at ¶ 36, quoting McKenzie, supra.
 {¶ 85} Moreover, we find that Mother's assertion that CPSU never really intended to achieve reunification and that Traxler, in particular, was biased against her, lacks merit. Mother's sole support for her assertion was the testimony of J.P.'s therapist at the Center, Mitchell, that Traxler sometimes focused on the weaknesses of the family more so than its strengths. However, numerous witnesses testified that CPSU, and specifically Traxler, were not biased toward Mother, and Mitchell herself admitted that he may have merely been attempting to inform her of the entire situation. Indeed, the evidence indicates that CPSU exercised great diligence in attempting to reunite Mother with the children. Thus, we find that the trial court's determination that CPSU made reasonable efforts to reunify the family was supported by competent, credible evidence.
 {¶ 86} Accordingly, we overrule Mother's first assignment of error.
 Assignments of Error Nos. II and VI {¶ 87} In her second assignment of error, Mother contends that the trial court's decision to terminate her parental rights and grant CPSU permanent *Page 36 
custody of the children was against the manifest weight of the evidence.[10] Specifically, Mother asserts that the evidence demonstrated that she made significant progress over the past six months prior to the hearing and that she may be able to take care of the children within a year.
 {¶ 88} Likewise, in her sixth assignment of error, Mother contends that the trial court erred in granting CPSU permanent custody of the children because it is not in their best interests. Specifically, Mother asserts that the evidence demonstrated that her involvement in the children's therapy contributed toward their progress and that granting permanent custody to CPSU would be traumatic and detrimental to the children. We disagree.
 {¶ 89} Once a child has been adjudicated dependent, neglected or abused and temporary custody has been granted to a children services agency, the agency may file a motion for permanent custody under R.C.2151.415(A)(4). Guidelines for the permanent custody hearing and the determinations the trial court must make are set out in R.C. 2151.414. R.C. 2151.414(B) provides, in pertinent part:
 (1) * * * the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply: *Page 37 
 (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. * * *
 (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999. For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.
 {¶ 90} Once the trial court has determined that one of the conditions of R.C. 2151.414(B)(1) exists, it must then determine by clear and convincing evidence that permanent custody is in the best interest of the children. The best interest determination focuses on the child, not the parent. R.C. 2151.414(C) prohibits the trial court from considering "the effect the granting of permanent custody to the agency would have upon any parent of the child." When determining whether it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody, the trial court shall consider all relevant factors including, but not limited to, those listed in R.C. 2151.414(D).
 {¶ 91} Here, Mother argues that granting CPSU permanent custody of the children is not in their best interests because the evidence revealed that doing so *Page 38 
would be traumatic and detrimental to them, and because she contributed to their progress. However, Mother's assertions that she contributed to the children's progress and that severing her ties with them would negatively impact them are only partially correct. The testimony also indicated that Mother contributed greatly to the children's problems; that severing Mother's ties with the children would be traumatic in the short term, but better in the long term; that Mother could not adequately parent the children or provide a stable environment despite over two years' worth of treatment and services; that Mother continued to remain in a relationship with Owens despite his criminal issues, drug abuse, and domestic violence problems; that J.P. would never be able to return to Mother; and, that both children would need extensive therapy in a safe environment, particularly J.P. The trial court considered these facts and the children's wishes, along with the requisite factors enumerated under R.C. 2151.414(D), in determining the best interest of the children. Thus, we find that the trial court's finding that granting CPSU permanent custody was in the best interest of the children was supported by competent, credible evidence.
 {¶ 92} In addition to determining that granting CPSU permanent custody was in the children's best interest, the trial court was also required to find that one of the conditions under R.C. 2151.414(B) applied. However, the trial court found *Page 39 
that R.C. 2151.414(B)(1)(d) had been met and, alternatively, that R.C.2151.414(B)(1)(a) had also been met.
 {¶ 93} Here, Mother's argument that the trial court's grant of permanent custody to CPSU was against the manifest weight does not appear to challenge the trial court's finding that the children were in CPSU's temporary custody for at least twelve months of a consecutive twenty-two month period prior to CPSU's motion for permanent custody under R.C. 2151.414(B)(1)(d).[11] Instead, Mother's argument seems targeted toward the trial court's finding that the children could not or should not be returned to any of the parents within a reasonable time under R.C. 2151.414(B)(1)(a). However, when a trial court finds that R.C. 2151.414(B)(1)(d) has been met and makes a best interest determination, it is not required to also determine that the children could not or should not be returned to any of the parents within a reasonable time under R.C. 2151.414(B)(1)(a). In re William S. (1996),75 Ohio St.3d 95, 99; In re Lopez, 166 Ohio App.3d 688, 2006-Ohio-2251; R.C. 2151.414(B). Therefore, our review could end here.
 {¶ 94} Nevertheless, because the trial court found that R.C.2151.414(B)(1)(a) had been met and because Mother's manifest weight argument appears directed to that finding, we will briefly address it. Mother asserts that the *Page 40 
evidence demonstrated that she made significant progress over the past six months prior to the hearing and that she may be able to take care of the children within a year. However, ample testimony indicated that, while Mother completed the requisite programs and did make some progress, her behavior and parenting did not meaningfully change; that she continued to experience instability with Owens despite extensive marital and domestic violence counseling; that she continued to have criminal issues; that any future progress depended on numerous factors; that she has a serious personality disorder; and, that she still needed years of intensive treatment. Thus, we find that the trial court's determination that the children could not or should not be placed with either parent within a reasonable time was supported by competent, credible evidence.
 {¶ 95} Accordingly, we overrule Mother's second and sixth assignments of error.
 {¶ 96} Having found no error to the Appellant herein, in the particulars assigned and argued, we affirm the judgments of the trial court.
Judgments affirmed. SHAW and WILLAMOWSKI, JJ., concur. r
[1] We note that neither Father nor Owens is appealing the trial court's decision.
[2] CPSU moved to strike its prior allegations of neglect, which the trial court granted.
[3] We note that Mother renewed her oral motion to dismiss Owens as a party on the final day of the hearing, when Owens failed to appear. Owens' attorney was able to contact Owens, who was very upset because he was unable to find a ride to the courthouse and wished to be dismissed from the case. Near the close of the hearing, Mother again moved to dismiss Owens as a party and strike all testimony regarding him from the record, which the trial court denied, reiterating that he had been a party throughout and was a vital part of the case.
[4] Traxler explained that Mother and Owens had been separated for a while and that, while he was still a party to the case, Owens did not participate in the services offered by CPSU or interact with the family during that period. Once Mother and Owens reconciled, he resumed participation.
[5] Bouillon stated that the typical home-based therapy program lasted twelve weeks.
[6] Likewise, Patrolman David Hocanson of the Findlay Police Department testified that he was dispatched to Mother's and Owens' residence two separate times within an hour in March 2005 for a domestic dispute, and Officer Steven Kiser of the Tiffin Police Department testified that he responded to a domestic dispute involving Mother and Owens in September 2006. No charges were filed in any of these incidents.
[7] Liebert indicated that, based upon her knowledge of J.P.'s problems, he would not be able to return to the residence or ever be able to reside in the same home as G.P.
[8] Dr. Connell explained that his diagnosis of Mother significantly overlapped with her diagnosis of personality disorder, not otherwise specified, that she received from other professionals.
[9] The trial court issued separate journal entries regarding the children; however, the journal entries were nearly identical. Thus, we have elected to summarize the trial court's findings for the children together.
[10] We note that, although Father is not a party to this appeal and, in fact, has had little or no involvement with this case, we find that the trial court's determination to terminate his parental rights and grant permanent custody of the children to CPSU is supported by competent, credible evidence.
[11] The trial court adjudicated the children dependent on January 9, 2004, and CPSU did not move for permanent custody until October 20, 2005. Thus, the trial court correctly determined that the children were in CPSU's temporary custody for at least twelve months of a consecutive twenty-two month period under R.C. 2151.414(B)(1)(d). *Page 1